ELLEN J. Ross, Known Professionally as JANE FROMAN, Appellant, et al., Plaintiffs, *v.* PAN AMERICAN AIRWAYS, INC., Respondent.

Argued February 22, 1949; decided April 14, 1949.

*Irving Lemov* and *Michael Halperin* for appellant. I. Special Term erred in holding, as a matter of law, that Abraham had implied authority to accept a passenger ticket as agent for plaintiff, limiting defendant's liability in the sum of $8,291.87, for the issue of implied agency is a question of fact which may only be determined by a jury. (*Hedeman* v. *Fairbanks, Morse & Co.,* 286 N. Y. 240; *Booth* v. *Litchfield,* 201 N. Y. 466; *Bickford* v. *Menier,* 107 N. Y. 490; *Northern Assur. Co.* v. *B. A. W. Trucking Co.,* 252 App. Div. 323; *The Majestic,* 166 U. S. 375; *Saunders* v. *Southern Ry. Co.,* 128 F. 15; *Rosen* v. *Equitable Paper Bag Co.,* 286 N. Y. 410; *Wittemann* v. *Sands,* 238 N. Y. 434; *King* v. *Lafayette Nat. Bank,* 263 App. Div. 830.) II. It appearing that an issue of fact is presented as to whether an agreement to engage in international transportation was entered into and whether a ticket was delivered, Special Term was not authorized to determine the issues on this motion summarily. (*Dwan* v. *Massarene,* 199 App. Div. 872; *Werfel* v. *Zivnostenska Banka,* 287 N. Y. 91; *Cohen* v. *Eleven West 42nd St.,* 115 F. 2d 531.) III. There is a question of fact which may only be determined by a jury as to whether a contract for international transportation, within the meaning of the Warsaw Convention,

limiting defendant's liability, was in fact entered into and is binding upon plaintiff. (*Edwards* v. *Noyes,* 65 N. Y. 125; *Nichols* v. *Kingdom Iron Ore Co.,* 56 N. Y. 618.) IV. The transportation of plaintiff was performed by the United States Government and, therefore, the Warsaw Convention does not apply.

*Donald Havens* and *Spencer V. Silverthorne, Jr.,* for respondent. I. A passenger ticket was delivered to the person whose duty it was to receive it. (*Garcia* v. *Pan American Airways,* 269 App. Div. 287, 295 N. Y. 852; *Indemnity Ins. Co. of No. America* v. *Pan American Airways,* 58 F. Supp. 338; *Murray* v. *Cunard S. S. Co.,* 235 N. Y. 162; *New York Central & Hudson Riv. R. R. Co.* v. *Beaham,* 242 U. S. 148.) II. The evidence is clear and undisputed that the ticket which was delivered to Abraham was in compliance with the Warsaw Convention. III. The transportation was not performed by the United States.

DESMOND, J. Plaintiff-appellant, a passenger on one of defendant's transatlantic airplanes, was injured when the plane crash-landed in the Tagus River, near Lisbon, within the Republic of Portugal. Of her complaint against defendant, the first cause of action only is before us on this appeal, since that cause of action was dismissed at Special Term and the Appellate Division affirmed that dismissal and granted plaintiff leave to appeal to this court. What we have to determine is the meaning and application, as to the facts exhibited in this record, of certain provisions of the so-called "Warsaw Convention", a treaty to which thirty nations, including the United States, are parties and which treaty (printed in full in 49 U. S. Stat., part 2, p. 3000 *et seq.*) regulates and limits the liability of air carriers engaged in international transportation, as "international transportation" is defined in the Convention. The New York courts have dealt with the Convention, although not as to the precise point principally here involved, in *Wyman* v. *Pan American Airways* (181 Misc. 963, affd. 267 App. Div. 947, affd. 293 N. Y. 878, certiorari denied 324 U. S. 882) and *Garcia* v. *Pan American Airways* (183 Misc. 258, affd. 269 App. Div. 287, affd. 295 N. Y. 852, certiorari denied 329 U. S. 741, and also 274 App. Div. 996). (The *Garcia* suit is by the executors of a passenger killed in this same February 22, 1943 disaster.) On the

present appeal, unlike the *Wyman* and *Garcia* decisions (*supra*), the real dispute is as to whether the facts brought out in the motion papers conclusively rebut, as the courts below held that they did rebut, the contention of plaintiff that no passenger ticket was " delivered " to her by defendant, such delivery being required by the Convention (art. 3) as a condition for limitation of the carrier's liability.

Appellant's first cause of action alleges the plane crash and her resulting injuries, sets out the law of Portugal as to liability of air carriers for injuries to passengers, and demands damages of $1,000,000. The answer, besides denials, affirmatively alleges that the flight was " international· transportation " subject to the rules of the Warsaw Convention, and that accordingly, defendant is (in the absence of willful misconduct — see Convention, ch. III, art. 25 — which is not alleged in the first cause of action) liable for no more than 125,000 francs, or $8,291.87 at the rate of exchange specified in the Convention (art. 22). Defendant, urging that $8,291.87 was this plaintiff's maximum possible recovery, moved on affidavits for summary judgment dismissing the first count. Plaintiff countered with affidavits, to which we will refer later. The Special Term Justice first denied the motion, ruling that rules 113 and 114 of the Rules of Civil Practice were not available to defendant since defendant claimed only that excessive damages were being demanded in the complaint. Defendant, however, moved for reargument of its motion, conceding that it was liable for plaintiff's damages up to $8,291.87, and informing the court that neither party was urging any technical grounds as to the propriety of the summary judgment procedure but that both desired a determination, on the merits of the question as to whether the limitations of the Convention operated against plaintiff's claim. Special Term thereupon held that the Convention required a holding that defendant's liability herein may not exceed $8,291.87. As to the main question argued — delivery of a ticket — Special Term found from the affidavits that the person (a Mr. Abraham, hereafter mentioned) who had physically taken delivery of the ticket issued by defendant in appellant's name had either express or implied authority to take delivery of that ticket on behalf of plaintiff. Special Term thereupon granted summary judgment of dismissal as to the

first cause of action, giving appellant leave (which leave has not been availed of) to amend that cause of action by reducing the amount of her demand to $8,291.87. On the affirmance by the Appellate Division, no opinion was written, but one Justice dissented and voted to reverse and deny the motion '' on the ground that there are triable issues of fact '', presumably as to the delivery of plaintiff's ticket. As to procedure below, we hold that it was proper under the circumstances, and because of the position taken by counsel at Special Term, to deal with this question by way of summary judgment — that is, it was permissible for Special Term to decide whether or not there was a triable issue of fact, and, accordingly, to grant or deny summary judgment.

Now as to whether appellant's ticket was '' delivered '' within the meaning of paragraphs (1) and (2) of the third article of the Convention, which paragraphs read as follows:

'' (1) For the transportation of passengers the carrier must deliver a passenger ticket which shall contain the following particulars:

'' (a) The place and date of issue;

'' (b) The place of departure and of destination;

'' (c) The agreed stopping places * * *;

'' (d) The name and address of the carrier or carriers;

'' (e) A statement that the transportation is subject to the rules relating to liability established by this convention.

'' (2) The absence, irregularity, or loss of the passenger ticket shall not affect the existence or the validity of the contract of transportation, which shall none the less be subject to the rules of this convention. Nevertheless, if the carrier accepts a passenger without a passenger ticket having been delivered he shall not be entitled to avail himself of those provisions of this convention which exclude or limit his liability.''

Plaintiff-appellant is a theatrical performer. Her affidavit on this motion shows that sometime before February 19, 1943, she had made an arrangement with U.S.O. Camp Shows, Inc., the substance of which was that she volunteered '' to entertain soldiers in the war areas '' abroad. Her information was that U.S.O. Camp Shows, Inc., had some arrangement with the United States Government, whereby the former supplied enter-

tainment and entertainers for our troops in those areas. Appellant, according to her affidavit, did not know, until after she had boarded the plane which later crashed, what her destination was or by what conveyance she was to travel. Her previous contacts in the matter were with Mr. Saul Abraham, an officer or employee of U.S.O. Camp Shows, Inc., who instructed her, on February 19, 1943, to get her baggage ready and, later, on the day the plane took off, went with her to La Guardia Airport where she boarded defendant's *Yankee Clipper*. She avers in that opposing affidavit that she did not pay for her passage on the plane, never received any passage ticket at any time, knew nothing of any limitations as to liability and never authorized Mr. Abraham or anyone else to accept a passage ticket for her, or to bind her to any limitation of the carrier's liability. However, in the same affidavit she states that " Mr. Abraham was in charge of all arrangements up to the point of embarkation ", and she files, with her own affidavit, an affidavit by Abraham. Abraham's affidavit says this, in substance: he was employed by U.S.O. Camp Shows, Inc., and " was in charge of arranging transportation for theatrical performers who were planning to go overseas to entertain men serving in the Armed Forces "; he received (from some person not named) a list of those who were to go overseas, and had each of those persons fill out a " ' personnel security questionnaire ' " which Abraham sent to a United States War Department official; he (Abraham) had the performers (including appellant) fingerprinted, and went with them to apply for and receive passports and visas; the arrangements for the purchase of tickets for performers' passage were made not by Abraham or U.S.O. Camp Shows, Inc., but by the United States Army which notified Abraham to pick up the tickets at defendant's office in Manhattan, which Abraham did, being instructed by someone (presumably an Army officer) not to disclose the date or time of departure but to assemble the performers and have them ready for immediate departure; when notice came to Abraham (presumably from the Army) that departure time was at hand, Abraham escorted all the performers, including appellant, to the Marine Terminal at La Guardia Airport, he still having in his possession the tickets, not yet shown to any of the performers; at the airport, Abra-

ham "lined up all the performers" in front of desks and "placed in front of each his or her passport and ticket"; defendant's clerks tore off from each ticket the New York-to-Lisbon stub, and passed the rest of the tickets and the passports along the desks at which were seated custom inspectors, the performers likewise moving along in front of these desks as their tickets and passports were passed down the line; at the end of the line of desks the tickets and passports were handed back to Abraham, who held them until the plane's impending departure was signalled, when he put in the hands of each performer her passport and a slip of paper (not the ticket itself) admitting her to the plane; Abraham gave the tickets to another U.S.O. Camp Shows, Inc., employee or representative, who boarded the plane but was killed in the crash, the tickets being lost. However, attached to one of defendant's affidavits there is a copy of appellant's ticket, issued in her name and made out for travel from New York to the United Kingdom via Lisbon and back to New York, with intermediate stops, containing a notation, as required by the Warsaw Convention (see as quoted *supra,* p. 93), that "Transportation hereunder is subject to the rules relating to liability established by the Convention of Warsaw". This copy of a ticket is in exactly the same form as the one on which passenger Diaz traveled in *Garcia* v. *Pan American Airways* (*supra*) and the holding there was (see, also, motion in that case decided herewith, p. 798) as it must be here, that the flight of defendant's *Yankee Clipper* during which appellant was injured, was "international transportation" to which the Warsaw Convention was applicable, and that the ticket issued in appellant's name complied in form and content with article 3 of the Convention.

Appellant insists, however, that no ticket was ever delivered to her or anyone authorized by her, or, at least, that those were triable questions of fact. The Convention itself does not say, nor does appellant argue, that the language of article 3 makes physical delivery of the ticket into the passenger's own hand a requisite for the limitation of liability. But, says appellant, there must be delivery to someone authorized by the passenger to take, for the passenger, delivery of a ticket expressing the limitation — and Abraham, says appellant, was never commis-

sioned by her to receive a ticket for her and never licensed to accept, for her but without her knowledge, a ticket which by its terms, and because of its points of departure and return, put into operation against her although unknown to her, the drastic restrictions of the Warsaw Convention. There is, of course, no affirmative showing here of any specific instruction from appellant to Abraham accrediting him to act for her in respect to this particular kind of ticket or any ticket. Perhaps such authorization could be spelled out of the statements in her (and Abraham's) affidavit that he " was in charge of all arrangements up to the point of embarkation " or out of the undisputed fact that appellant knew that Abraham had procured a passport for her, ordered her luggage sent to an airline office, and had escorted her to a marine airport, which certainly was notice to her that, pursuant to negotiations by him, she was about to take passage in an overseas plane for some destination outside the United States. Whether or not all this added up, as matter of law, to a sufficient showing of authority in Abraham, it can hardly be disputed that, when a ticket bearing appellant's name and all particulars as to the intended route as well as a reference to the Warsaw Convention limitation, was laid in front of appellant on the table in the airport, she, by thereafter boarding the plane as a traveler on that ticket, impliedly, if not expressly, ratified and adopted what had been done by the Army, and later by Abraham, in taking out that ticket in her name.

Thus the special, and undisputed, facts in these affidavits make impossible, as matter of law, any finding other than that the ticket was " delivered ", and so it was right to hold that the top limit of recovery was $8,291.87.

And the same result is reached by examining into the general purport and purpose of the Convention and its article 3. We have held elsewhere that this identical New York-to-Lisbon-and-return journey was " international transportation " the law of which was the Warsaw Convention (*Garcia* v. *Pan American Airways, supra*), and that the international code of law expressed in the Convention overrides and supplants any contrary local law as to the legality of limiting a carrier's liability (*Wyman* v. *Pan American Airways, supra*). Plaintiff, of course, was presumed to know the law and was bound thereby. Furthermore, while the Convention speaks of transportation under a

" contract " and requires delivery of a ticket warning of the limitation, it is plain that the limitation is one created by the Convention itself, and is not the product of consensual arrangements between the parties. Paragraph (2) of article 1, in its reference to " the contract made by the parties " means, obviously and on its face, not that the Convention applies only when the parties contract for its application, but that it applies (unless by special arrangement otherwise) whenever, " according to the contract made by the parties ", the place of departure and the place of ultimate destination are within the territories of two of the " High Contracting Parties " or both within the territory of a " single High Contracting Party " with certain agreed stopping places elsewhere. Put another way, that means that the Convention becomes the law of the carriage when the " contract " of the parties provides for passage between certain described termini. When such is the contract, then the Convention has automatic full impact, by its own terms and not because the parties have so agreed. The requirement of article 3 of the Convention, quoted in the third paragraph of this opinion, that there must be delivery of a ticket is thus a condition set up by the Convention itself, as a determinant of the applicability, or no, of the Convention's limited liability rules; but that is by no means the same thing as saying that the limitation is a contractual one, depending for its existence and validity on express assent thereto by the passenger. Since the Convention itself, as a statute, grants and mandates the limitation unless " the carrier accepts a passenger without a passenger ticket having been delivered ", there is no need for a carrier who claims the limitation to show more than the delivery of an appropriate ticket, and travel of the passenger thereunder. Parenthetically, we note that under New York cases and cases elsewhere, even where the limitation is purely contractual, acceptance of a transoceanic ticket stating the limitation " ' gives rise to an implication of assent ' ", whether the ticket be read by the passenger or not (*Reichman* v. *Compagnie Generale Transatlantique,* 290 N. Y. 344, and cases cited at p. 351). We close this part of the opinion by this comment: this treaty, like any other statute, must be construed reasonably and so as to accomplish its obvious purposes (see *Matter of Zalewski,* 292 N. Y. 332, 336). In his letter to the President send-

ing the Convention to him preparatory to transmission to the Senate, former Secretary of State Hull pointed out that article 17 of chapter III benefited passengers by creating a presumption of liability on the mere happening of an accident and further described the beneficial purposes of the treaty as follows:

" It is believed that the principle of limitation of liability will not only be beneficial to passengers and shippers as affording a more definite basis of recovery and as tending to lessen litigation, but that it will prove to be an aid in the development of international air transportation, as such limitation will afford the carrier a more definite and equitable basis on which to obtain insurance rates, with the probable result that there would eventually be a reduction of operating expenses for the carrier and advantages to travelers and shippers in the way of reduced transportation charges." (Senate Doc., executive G, 73d Cong., 2d Sess., p. 3.)

Those aims would be poorly served by any holding that the limitation of liability is available only when a carrier can produce affirmative proof not only that the passenger ticket complied with the Convention, but that the individual who bought that ticket at the carrier's ticket counter, was the passenger himself or someone specifically authorized by the passenger to consent, on the latter's behalf, to limited liability.

Coming back to the undisputed facts of the case we have before us, let us remember that, as to defendant, this was a routine sale, in ordinary course of its common carrier business, of a ticket which nominated appellant as the intending passenger. If there was here any failure adequately to inform appellant of her subjection to the Warsaw Convention, that failure was not defendant's — and yet, if we were to hold that there was, somehow, lack of appropriate " delivery " here, defendant would be the loser. Putting it another way: it was no concern of the carrier as to what the arrangements were between the passenger and the person who took delivery of the ticket.

Turning to another question: one of the other points in appellant's brief argues that " The transportation of the plaintiff was performed by the United States Government and, therefore, the Warsaw Convention does not apply." The adherence by the United States to the Convention was expressly made subject to a reservation which any high contracting party

had the right to declare at the time of ratification. That reservation, as expressed in the additional protocol (see 49 U. S. Stat., part 2, p. 3025) was " that the first paragraph of article 2 of this convention shall not apply to international transportation by air performed directly by the state ". In proclaiming the treaty, the President described (see 49 U. S. Stat., part 2, p. 3013) the reservation a little differently, as follows: " that the first paragraph of Article 2 of the convention shall not apply to international transportation that may be performed by the United States ". (The President omitted the word " directly ".) Taking either wording of the reservation, it is plain that appellant's transportation was not " performed by the United States ". The United States Army, apparently, bought appellant's ticket but her transportation was, as she herself alleged in paragraph Fourth of her complaint here, on an aircraft " owned, operated and controlled by the defendant."

We should point out that there is no question here of the effect, on appellant's ultimate rights, of so much of article 25 of the Convention as says that the carrier shall not be entitled to limitation of his liability to the passenger " if the damage is caused by his wilful misconduct ". Willful misconduct is not alleged in the first cause of action (which has been dismissed) of this complaint, although it is charged in the third count, which stands undismissed.

The order should be affirmed, with costs, the first certified question answered in the affirmative, the second and fourth certified questions answered in the negative, and the third certified question not answered.

CONWAY, J. (dissenting). This is an appeal by Ellen Jane Ross (hereinafter referred to as plaintiff or appellant), known as Jane Froman, from a nonunanimous order of the Appellate Division, First Department, affirming without opinion an order of Special Term (BOTEIN, J.) which granted defendant's motion for summary judgment dismissing the complaint as to the first cause of action " with leave to the plaintiffs to amend the complaint by reducing the amount of the damages demanded in the first cause of action " to $8,291.87. The Appellate Division granted leave to appeal and certified the following four questions:

" 1. Upon the record here, should the defendant's motion for summary judgment be granted and the first cause of action dismissed?

" 2. Upon the record here, has the plaintiff shown sufficient evidence to create a triable issue of fact?

" 3. Was Mr. Abraham of the U.S.O. Camp Shows, Inc. an agent of the plaintiff-appellant, authorized to receive a ticket on her behalf, for international transportation under the Warsaw Convention?

" 4. Was the plaintiff-appellant's transportation, alleged in this action, performed by the United States government, within the meaning of the Warsaw Convention, so as to exclude such transportation from the application of the limitation provision of the Warsaw Convention? "

The complaint alleged four causes of action. Briefly, the first cause of action alleged that appellant while riding as a passenger in one of defendant's seaplanes known as the *Yankee Clipper* suffered severe bodily injuries when the plane crashed near Lisbon, Portugal, on February 22, 1943, and that the accident was caused by the negligence of defendant. Defendant's motion for summary judgment was addressed solely to the first cause of action in which appellant alleged damages to the extent of $1,000,000.

The third cause of action alleged that the accident was due to the " wilful misconduct " of defendant. The second and fourth causes of action sought recovery for loss of baggage in the sum of $10,000 and for medical expenses and for loss of society to the extent of $100,000.

In its answer the defendant pleaded five affirmative defenses, the first two of which are based on the international treaty commonly known as the " Warsaw Convention " which was concluded at Warsaw, Poland, on October 12, 1929, and to which the United States became a party with reservation by Proclamation of the President, dated October 29, 1934, as advised by the Senate of the United States. (49 U. S. Stat., part 2, p. 3000 *et seq.*)

In its first defense defendant alleged that at the time appellant was injured " she was being transported under a contract of transportation wherein the place of departure and the place of destination were within the United States and there were

agreed stopping places at Lisbon, Portugal, the United Kingdom of Great Britain and Northern Ireland, and Natal, Brazil; that said transportation was international transportation within and subject to the * * * Warsaw Convention * * *'', and therefore defendant's liability, if any, was limited by the terms thereof to 125,000 francs or its equivalent, $8,291.87.

In the second defense defendant alleged that appellant and defendant entered into a contract of transportation '' evidenced by a ticket in writing '' which contained certain terms and conditions of the Warsaw Convention. As in the first defense, defendant alleged that the rights of the parties were governed by the rules relating to liability established by the Warsaw Convention; that the defendant duly complied with all the conditions and requirements thereof; that the defendant took all the necessary measures to avoid the damages claimed by plaintiff and that defendant claimed exemption from, and limitation of, liability in accordance with the rules of the Warsaw Convention.

The remaining defenses were not referred to on defendant's motion for summary judgment and are not material here.

Defendant moved for an order under rules 113 and 114 of the Rules of Civil Practice granting summary judgment dismissing plaintiffs' first cause of action. The defendant submitted two affidavits in support of the motion. One, by its attorney, contained a discussion of the provisions of the Warsaw Convention and the law. The other was made by Robert Waters, a '' Traffic Representative in the New York District Sales Office '' of the defendant. He alleged that on February 15, 1943, he was instructed to prepare reservation sheets for a number of passengers who were scheduled to depart from New York on a round-trip flight to the United Kingdom for the purpose of entertaining soldiers in the European area, under the management of U.S.O. Camp Shows, Inc., and that appellant was among the passengers. He prepared the reservation sheets and sent them to the ticket department for preparation of the tickets. The tickets were delivered to Mr. Saul Abraham of U.S.O. Camp Shows, Inc. The auditor's stub was detached from the ticket issued in the name of appellant and retained by defendant. The remainder of the ticket was delivered to Mr. Abraham and was presumably lost at the time of the accident. Attached to the affidavit is a facsimile of the portion of the

ticket delivered to Mr. Abraham. Also annexed to the affidavit is a photostatic copy of the flight coupon portion of the ticket covering the leg of the flight from New York to Bermuda which it is alleged would have been surrendered by the passenger upon embarkation at New York. The affidavit explains the abbreviations on the facsimile ticket and recites the amount of the fare. That was the extent of defendant's proof. There was no allegation that defendant received any instructions to prepare the tickets from appellant or that the ticket was delivered to her personally.

Appellant submitted three affidavits in opposition to the motion. One was executed by her attorney and contained a discussion of the terms of the Warsaw Convention and of the law. The second was her own affidavit and alleged that during the last war and on or about February 15, 1943, she was engaged in endeavoring to entertain soldiers in the war areas, '' by arrangement with the USO Camp Shows Inc.'' which she believed had an arrangement with the United States Government to supply such entertainment for the armed forces in the various war areas. It is to be noted that she did not allege that she was *employed* by either the War Department or U.S.O. Camp Shows, Inc., and that the defendant does not allege it either. She further stated: '' I received no advance information from either the Government or USO Camp Shows Inc. as to when and where I was to go and by what mode of transportation.'' On February 19, 1943, she was instructed by Mr. Abraham of U.S.O. Camp Shows, Inc., to prepare her baggage and shortly thereafter he picked her up and brought her to La Guardia Airport. It was not until after she had boarded the airplane that she had any information as to her destination. She said that '' Mr. Abraham was in charge of all arrangements up to the point of embarkation.'' *She received no passage ticket and was not informed by anyone that a ticket had been purchased in her name. She did not authorize Mr. Abraham or anyone else to accept a passage ticket for her.* She did not pay for the passage and she believed '' that the Government of the United States, through the Special Service Division of the War Department '' arranged for her passage. She suffered permanent injuries which prevented her from walking and from engaging in her profession with a consequent loss of earnings and

medical expenses up to that time in excess of $200,000, and that she was informed and believed that she had a good and meritorious cause of action far in excess of the amount of limited liability provided in the Warsaw Convention.

Appellant also submitted an affidavit by Mr. Abraham, an employee of U.S.O. Camp Shows, Inc., who stated that he was in charge of arranging transportation for theatrical performers who were to be sent overseas. When he learned the names and addresses of the performers who were to go overseas on this flight of the *Yankee Clipper* he had them fill out and sign a " ' personnel security questionnaire ' ", a copy of which he sent to the Special Service Division of the War Department in Washington. Thereafter, the performers were fingerprinted and applications for passports and visas filled out. His affidavit then stated, " USO-Camp Shows, Inc. *never made any arrangements for the actual transportation of the performers. The arrangements were made by the War Department* and, in this instance, I was notified a few days prior to the date of departure that the War Department had made arrangements for the performers to leave New York on a Pan-American Airways' clipper and was told to pick up the tickets at the Airlines Building at 80 E. 42nd Street, New York City. I, personally, attended to the matter of picking up the tickets." (Emphasis supplied.) For the purposes of this motion those statements must be taken as true. Moreover, those statements are confirmed by the admission in defendant's own bill of particulars which alleged: " On information and belief, the persons who acted on plaintiff's behalf were a Mr. Abrams [Abraham], of USO Camp Shows, Inc., and a Captain Malone of the War Department." The date and time of departure was a military secret, and he was finally instructed to assemble the performers and have them available for immediate departure. He personally brought the group to La Guardia Airport at which time he still had the tickets in his possession which he had picked up at the Airlines Building and which he had not shown to any of the performers. At the airport he showed the tickets and passports to the customs inspector who ushered the group into a large rotunda where there were several of defendant's clerks behind a number of desks. He said, " I lined up all the performers in front of these desks and placed in front of each his or her passport and ticket. The clerks tore the ' New

York-Lisbon ' stub from each ticket and passed tickets and passports along to the desks at which were seated various customs inspectors as the performers likewise moved passed [*sic*] these desks. I was standing at the end of the line of desks and after the inspectors checked the tickets and passports, *they handed them to me.*" (Emphasis supplied.) Defendant does not allege and Special Term did not find that that was personal delivery to appellant. Reliance is solely on implied agency in Abraham to receive for appellant a ticket for *international transportation.*

When the party entered the gate to board the plane he gave each of the performers his or her passport and " a slip of paper which had been inserted therein at the time they were inspected by the Customs Officials, which slip of paper entitled the performer to board the plane." He instructed the performers to give their passports to Mr. Rognan, who had been selected as manager of the company, and he personally handed Mr. Rognan all of the tickets. That was the last he saw of them.

Special Term dismissed defendant's original motion with the following memorandum: " This is a motion pursuant to rules 113 and 114 of the Rules of Civil Practice for summary judgment dismissing the first cause of action. *It is clear from the moving papers that even if the defendant's contentions are correct plaintiff may be entitled to recover up to $8,291.87*. The cause of action may not be dismissed pursuant to rule 113 of the Rules of Civil Practice merely because it seeks an excessive amount of damages. Nor may defendant obtain relief under rule 114 of the Rules of Civil Practice. * * * The claim asserted in the cause of action sought to be dismissed is a single and entire one and does not consist of one or more of several causes. It is to be noted that *defendant does not concede that plaintiff is entitled to judgment in the sum of $8,291.87 and does not move for judgment in favor of the plaintiff in that sum,* as did the defendant in *Garcia* v. *Pan American Airways, Inc.* (N. Y. L. J., April 26, 1947, p. 1644, col. 3). Motion denied." (Emphasis supplied.) (190 Misc. 974–975.)

Defendant then made a motion for reargument and submitted an affidavit of its attorney in which it conceded liability to the extent of $8,291.87 for the purpose of the motion. The affidavit stated, " In view of this concession, it is submitted that the said plaintiff, with respect to the first cause of action

alleged in the complaint, has failed to show any facts which might be deemed ' to present any triable issue of fact other than the question of the amount of damages for which judgment should be granted ' * * *." Thus the parties presented to Special Term the question whether it might be said that the Warsaw Convention was applicable here as a matter of law so that only $8,291.87 was recoverable or whether there were triable issues of fact as to its applicability.

Special Term granted the motion for reargument and thereupon granted defendant's original motion to dismiss the first cause of action " with leave to the plaintiffs to amend the complaint by reducing the amount of the damages demanded in the first cause of action " to $8,291.87. It handed down an opinion in which it was said:

" On this motion by defendant for reargument plaintiffs state in their brief that they do not ' urge the technical ground in opposition to the motion for summary judgment that summary judgment does not lie or that Rule 113 of the Rules of Civil Practice does not apply to the instant case.' Since plaintiffs as well as defendant desire a determination of the merits, the court will decide the original motion without regard to procedural obstacles.

" *The question presented* is whether the Warsaw Convention requires a holding that the defendant's liability cannot exceed the sum of $8,291.87. Defendant relies upon the case of *Garcia* v. *Pan American Airways, Inc.* (183 Misc. 258, affd. 269 App. Div. 287, affd. 295 N. Y. 852, certiorari denied 329 U. S. 741). Plaintiffs attempt to distinguish the cited case on two grounds, (1) that the defendant did not deliver a passenger ticket as required by article 3 of the Warsaw Convention, and (2) that the plaintiffs have alleged that the defendant was guilty of willful misconduct and therefore, by virtue of the provisions of article 25 of the Convention, defendant is not entitled to avail itself of the provisions of the Convention which exclude or limit liability.

" The second ground may be disposed of briefly. The motion seeks dismissal only of the first cause of action. That cause is predicated solely upon the alleged negligence of the defendant and contains no averment charging willful misconduct on the part of defendant. It is the third cause of action, not affected

by the present motion, which alleges that the accident occurred as the result of willful misconduct by the defendant.

" The claim that the defendant did not make delivery of a ticket within the meaning of article 3 of the Warsaw Convention also appears to be without merit. The Convention does not require that physical delivery be made to the passenger in person. The moving affidavit of defendant's traffic representative states that the ticket issued in the name of the female plaintiff was delivered to a Mr. Abraham of U.S.O. Camp Shows, Inc. The plaintiff was one of a group of entertainers scheduled to make the flight for the purpose of entertaining soldiers in the European area under the management of U.S.O. Camp Shows, Inc. The affidavit of the female plaintiff admits that ' Mr. Abraham was in charge of all arrangements up to the point of embarkation '. Abraham's affidavit also concedes that he was in charge of arranging transportation for the group, which included the female plaintiff. It seems clear that even if Abraham had no express authority to receive a ticket on behalf of the female plaintiff *he had implied authority to do so and that the delivery of the ticket to him is binding upon said plaintiff.* \* \* \*" (Emphasis supplied.) (190 Misc. 975–976.)

Thus the two primary questions presented to Special Term and the Appellate Division and certified to us as questions 2 and 3 were whether the plaintiff had shown sufficient evidence to create a triable issue of fact and whether Mr. Abraham was an agent of appellant authorized to receive a ticket on her behalf for " international transportation " under the Warsaw Convention as a matter of law.

Article 3 of the Warsaw Convention referred to by Special Term provides in part as follows:

" (1) For the transportation of passengers the carrier must deliver a passenger ticket which shall contain the following particulars:

" (a) The place and date of issue;

" (b) The place of departure and of destination;

" (c) The agreed stopping places, provided that the carrier may reserve the right to alter the stopping places in case of necessity, and that if he exercises that right, the alteration shall not have the effect of depriving the transportation of its international character;

" (*d*) The name and address of the carrier or carriers;

" (*e*) *A statement that the transportation is subject to the rules relating to liability established by this convention.*

" (2) The absence, irregularity, or loss of the passenger ticket shall not affect the existence or the validity of the contract of transportation, which shall none the less be subject to the rules of this convention. *Nevertheless, if the carrier accepts a passenger without a passenger ticket having been delivered he shall not be entitled to avail himself of those provisions of this convention which exclude or limit his liability.*" (Emphasis supplied.)

In our judgment Special Term erred in granting plaintiff's motion for summary judgment dismissing the first cause of action because appellant has clearly shown sufficient evidence to create a triable issue of fact. Accordingly question number 1 should be answered in the negative and question number 2 in the affirmative. We cannot say as a *matter of law* on this record that plaintiff authorized the War Department or U.S.O. Camp Shows, Inc., to contract on her behalf for " international transportation " within the meaning of the Convention, nor that Mr. Abraham of the U.S.O. Camp Shows, Inc., was authorized to accept delivery on her behalf of a ticket for such international transportation. Thus question number 3 must be answered in the negative.

· It is important to note that the War Department could have purchased transportation for appellant on defendant's airplane under at least three different arrangements in which the Warsaw Covention in its entirety, or its provisions limiting the defendant's liability, would not have been operative.

First, the Warsaw Convention provides in article 1, paragraphs (1) and (2) in part, as follows:

" (1) This convention shall apply to all *international transportation* of persons, baggage, or goods performed by aircraft for hire. * * *

" (2) For the purposes of this convention the expression ' international transportation ' shall mean any transportation in which, *according to the contract made by the parties*, the place of departure and the place of destination, whether or not there be a break in the transportation or a transshipment, are situated either within the territories of two High Contracting Parties, or within the territory of a single High Contracting

Party, if there is an *agreed stopping place* within a territory subject to the sovereignty, suzerainty, mandate or authority of another power, even though that power is not a party to this convention. Transportation without such an *agreed stopping place* between territories subject to the sovereignty, suzerainty, mandate, or authority of the same High Contracting Party shall not be deemed to be international for the purposes of this convention.'' ·(Emphasis supplied.)

Thus the Convention provides that it applies to '' international transportation '' when '' according to the contract made by the parties '' the transportation is to be performed between certain places of departure and certain places of destination. If the passenger does not *contract* to travel between such places so defined the Convention does not apply. It would not apply for example to the passage of a person making a one-way trip to Portugal, a country not a party to the Convention. That was one of the issues in the *Garcia* case (*supra*), and we so held. (See 269 App. Div. 287, 290–291, affd. 295 N. Y. 852, certiorari denied 329 U. S. 741).

Secondly, paragraph (1) of article 2 of the Convention provides: '' This convention shall apply to transportation performed by the state or by legal entities constituted under public law provided it falls within the conditions laid down in article 1.''

However, in the Proclamation of the President, dated October 29, 1934, the adherence of the United States was stated to be subject to the following reservation: (49 U. S. Stat., part 2, p. 3013) ''\* \* \* that the first paragraph of Article 2 of the convention shall not apply to international transportation that may be performed by the United States of America \* \* \*.'' The Convention is not applicable, therefore, to transportation '' performed '' by the United States Government.

Thirdly, paragraph (1) of article 22 which limits the liability of the carrier for each passenger to the sum of 125,000 francs provides: '' Nevertheless, by special contract, the carrier and the passenger may agree to a higher limit of liability.''

In accordance with that provision it was possible for the War Department to have entered into a '' special contract '' on behalf of plaintiff subjecting defendant to a higher limit of liability than 125,000 francs or its equivalent.

In order for defendant to prevail on this motion it was required to show *as a matter of law* that appellant authorized someone to enter into a contract in her name for "international transportation" within the meaning of the Warsaw Convention and that she authorized someone to accept delivery of a ticket for her for such transportation. While her papers indicate that she "was engaged in endeavoring to entertain soldiers in the war areas, by arrangement with the USO Camp Shows, Inc."; that she believed "the Government of the United States, through the Special Service Division of the War Department arranged" for her transportation; that Mr. Abraham was entrusted by the U.S.O. Camp Shows, Inc., with the duty of picking up her baggage, processing her passport application and accompanying her to the airport, it cannot be said *as a matter of law* that she authorized or consented to "international transportation" within the meaning of the Warsaw Convention with limited liability. Neither do the events at the airport compel that conclusion. Although the ticket with her passport was placed in front of her on a desk at the airport, the defendant has not alleged delivery to her personally and Special Term found no such personal delivery. It could not, for there was no attempt at proof that she even saw the ticket. The finding was that Mr. Abraham had implied authority on behalf of plaintiff to accept for her a ticket for "international transportation" as a matter of law. That was clearly a question of fact.

Nor can there be any question of ratification on this record either as a matter of fact or of law. Her entry into the plane did not constitute ratification by her *as a matter of law* of what had been done by the War Department or Mr. Abraham. The fact that she boarded the plane did not necessarily indicate "international transportation" under the Warsaw Convention as we have seen. Planes go from La Guardia Airport to all parts of the United States as well as to Europe. She says she had "no advance information from either the Government or USO Camp Shows, Inc. as to when and where I was to go and by what mode of transportation." On this motion that must be accepted as true. Ratification occurs only when the person claimed to have ratified a contract made by or an act done by another has full knowledge of all the material facts as to the contract entered into or of the act performed. (*Smith* v. *Kidd*, 68 N. Y. 130, 142.)

Moreover, ratification was not pleaded, was not alleged in the affidavits, was not urged in the briefs and was not found by Special Term.

Appellant could have reasonably assumed that her passage was being arranged under any of the three situations which we have mentioned above. '' International transportation '' under the Warsaw Convention with limited liability was not the only possible arrangement under which she could have been a passenger on defendant's airplane. She may be able to prove that she was acting under a reasonable assumption that she was only going to a place to which the Convention did not apply. She may well have assumed that she was about to fly to a place within the United States, e.g., to San Francisco to board another plane or a boat for the Pacific theatre of war. She may have assumed that it was transportation which was not covered by the Warsaw Convention because she had not agreed upon the '' agreed stopping place '' provided for in paragraph (2) of article 1 of the Convention, quoted (*supra,* pp. 107, 108) and since she had not so agreed, the Convention expressly excluded her transportation from the Convention.

Since the War Department was arranging her transportation to *war areas,* she may have reasonably assumed and may be able to prove that the Government was '' performing '' the transportation in such a manner that the Convention was inoperative. Defendant's proof is certainly not conclusive that appellant knew or should have known that the War Department had purchased a passenger ticket for her for '' international transportation '' on a privately operated commercial airline. The arrangement between the Government and the defendant may well have been such that the Government was '' performing '' the transportation within the meaning of the reservation to the Convention. That is for the trial. In fact appellant argues with some force that the instant transportation was '' performed '' by the United States Government. We need not now decide that question, which is the fourth question certified by the Appellate Division, in view of our conclusion that the order below should be reversed because a triable issue of fact exists with reference to question number 3.

Another reasonable assumption on appellant's part may have been that the War Department would enter into a '' special

contract " with defendant for liability in excess of the Convention limits for appellant's protection.

Thus we cannot say that the *only inference* which may be drawn from this record is that the War Department had implied authority to limit appellant's recovery by contracting for " international transportation " within the meaning of the Convention, or that Mr. Abraham had implied authority to accept such a ticket. Appellant is entitled to every favorable inference which may reasonably be drawn from the papers and in our judgment it is a fair inference which may be drawn that she did not consent to participate in " international transportation " under the Warsaw Convention with its limitations on the carrier's liability. That is clearly a question of fact.

Appellant should have an opportunity to prove that she expected the United States Government to " perform " the transportation, or that either a " special contract " or adequate insurance by defendant was to be arranged for her benefit. That is particularly so since she was not permitted to know her destination or method of transportation and thus could not herself obtain the insurance available to every passenger at railroad stations and airports and sold by the same clerks who sell transportation tickets, or at least that if " international transportation " with limited liability under the Warsaw Convention were arranged that she would be informed so that she might protect herself by purchasing insurance.

The Convention requires (1) that the ticket contain certain express particulars including " A statement that the transportation is subject to the rules relating to liability established by this convention " (art. 3, par. [1], cl. [e]) and (2) that unless the carrier deliver a ticket, it may not avail itself of the provisions of the Convention limiting its liability. The purpose of those requirements, of course, is to bring to the attention of the passenger that the carrier's liability is limited. When the Convention was concluded in 1929, only two years after Lindbergh's historic flight, international air travel was in its infancy. We were living in a different world and airlines were no doubt thought to need assistance in developing international air travel. There can be little doubt, however, that the framers of the Convention included the requirements mentioned in view of what my brother DESMOND has termed the " drastic restrictions " of the

Convention. They were drastic even in 1929. Injury or death from negligence of the carrier was fixed at 125,000 "French francs consisting of 65½ milligrams of gold at the standard of fineness of nine hundred thousandths" (art. 22, par. [4]), or $8,291.87. Since then our dollar has been devaluated 40% so that the total amount recoverable for injury or death due to negligence is less in 1929 dollar value than $5,000. In our opinion the aims and intendments of the Warsaw Convention and the protection of our own residents are best served by refusing summary judgment drastically limiting liability except upon proof that "international transportation" was contracted for by the passenger or her duly authorized agent and that a ticket was delivered, with the particulars required by the Warsaw Convention printed thereon to the passenger or his or her duly authorized agent. The airlines have been given the utmost consideration as against the passengers they are paid to transport. At least they should be held sharply to the doing of the few acts which are required by the Warsaw Convention in return for the consideration granted them.

The rule recited in *Reichman* v. *Compagnie Generale Transatlantique* (290 N. Y. 344, and cases cited at p. 351) that "' the act of acceptance '" of the ticket "' gives rise to an implication of assent '" to the terms contained therein has no application here. That rule presupposes delivery or acceptance of the ticket. Here the issue is not the failure of appellant to read the ticket, but the failure of defendant to deliver it to her or her agent.

The order should be reversed and questions number 1 and 3 answered in the negative, question number 2 answered in the affirmative and question number 4 not answered.

LOUGHRAN, Ch. J., DYE, FULD and BROMLEY, JJ., concur with DESMOND, J.; CONWAY, J., dissents in opinion in which LEWIS, J., concurs.

Order affirmed, etc.